**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TARA BUNNENBERG,**

                                        **Plaintiff,**

        **vs.**                                                    **1:22-CV-1174**
                                                                    **(MAD/DJS)**

**LIBERTY MUTUAL FIRE INSURANCE**
**COMPANY,**

                                        **Defendant.**
_____

**APPEARANCES:**                              **OF COUNSEL:**

**THE LAW OFFICES OF**                        **CHRISTOPHER BENES, I, ESQ.**
**CHRISTOPHER BENES**
2119 Skipper Court
Bellmore, New York 11710
Attorney for Plaintiff

**JAFFE & ASHER LLP**                         **MARSHALL T. POTASHNER, ESQ.**
445 Hamilton Avenue
Suite 405
White Plains, New York 10601
Attorney for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

Plaintiff Tara Bunnenberg ("Plaintiff" or "Bunnenberg") commenced this action in Albany

County Supreme Court on October 11, 2022.  *See* Dkt. No 2.  Plaintiff seeks to enforce a

$350,000 judgment that was awarded in her favor against Lauren L. McCormack in Nassau

County Supreme Court.  *See id.*  Plaintiff names Liberty Mutual Fire Insurance Company

("Defendant" or "Liberty Mutual") as the Defendant in this action because McCormack was

Liberty Mutual's insured at the time of the incident underlying this action. *See id.* Liberty Mutual removed the state court action to this Court on November 8, 2022. *See* Dkt. No. 1. Liberty Mutual maintains that it is not required to indemnify McCormack and pay the judgment to Plaintiff because the conduct between McCormack and Plaintiff is not covered under McCormack's insurance policy. *See* Dkt. No. 6. Following the denial of Defendant's motion for summary judgment, *see* Dkt. No. 46, this case proceeded to a bench trial on November 12, 2024. *See* Dkt. No. 73. At trial, Plaintiff called a single witness: herself.

Having reviewed the parties' pre-trial submissions, the trial transcript and exhibits, and the parties' post-trial briefs, the Court makes the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT[1]

### A.     Relationship Among Individuals and Background of Incident

1. In 2009, Bunnenberg dated non-party Cruz Rivera.

2. Sometime prior to October 25, 2011, McCormack was dating Rivera.

3. All three individuals attended State University of New York ("SUNY") Maritime College.

4. Approximately two weeks before October 25, 2011, McCormack had Rivera arrested for putting his hands on her which resulted in an order of protection being issued.

5. On October 25, 2011, Bunnenberg went to Rivera's dorm room between 10:00 and 11:00 PM.

---

[1] Prior to trial, the parties submitted a Joint Pre-Trial Stipulation which contained certain stipulated jurisdictional prerequisites and undisputed facts. *See* Dkt. No. 58. The Court's findings of fact are derived from the parties' stipulated facts and the trial transcript and exhibits. Throughout this Memorandum-Decision and Order, the Court will refer to the parties' exhibits as numbered in their respective exhibit lists, including proposed exhibits which were not admitted by the Court. *See* Dkt. Nos. 74, 75.

6. Rivera arrived to his room after soccer practice and he and Bunnenberg watched a movie until Rivera fell asleep around 1:00 AM on October 26, 2011.

7. McCormack called Rivera's cell phone numerous times and Bunnenberg answered the phone.

8. Bunnenberg told McCormack that McCormack should not be calling Rivera because of the order of protection and McCormack cursed at Bunnenberg. Bunnenberg hung up Rivera's cell phone.

9. Around 4:00 AM, McCormack arrived at Rivera's dorm room with another female friend.

10. A verbal altercation began between McCormack and Bunnenberg.

11. Rivera woke up and told McCormack to leave. Rivera did not want to touch McCormack because of the order of protection.

12. Then, "after a lot of screaming, . . . [Bunnenberg] felt a lunge, something felt like a punch. [She] had her eyes closed."[2]

13. McCormack punched Bunnenberg.

14. Bunnenberg had her arms up protecting the right side of her face where she previously had jaw surgery.

15. Bunnenberg began to bleed from the nose and lips.

16. Rivera stepped in between McCormack and Bunnenberg.

17. "In the course of the Incident, McCormack reached over Rivera, grabbed Bunnenberg by the ponytail in her hair, pulling both Rivera and Bunnenberg forward, and

---

[2] Dkt. No. 77 at 33.

3

McCormack then let go, propelling Bunnenberg to fall down so that her head struck the corner of the bed."[3]

18. McCormack yelled obscenities at Bunnenberg during the incident.

19. Bunnenberg yelled at McCormack to get out of the room.

20. Bunnenberg did not hit McCormack during the incident.

21. McCormack broke the orbital bone of Bunnenberg's left eye.

22. McCormack was arrested and criminally charged for her conduct.

**B.    Insurance Policy**

23. Liberty Mutual issued a Homeowners Policy for the period of November 7, 2010, to November 7, 2011, to McCormack's parents, James C. McCormack and Vivian L. McCormack.

24. The insurance policy contains the following language:

    a.   COVERAGE E - Personal Liability

          i.   If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will: 1. Pay up to our limit of liability for the damages for which the "insured" is legally liable.  Damages include prejudgment interest awarded against the "insured"; and 2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent.  We may investigate and settle any claim or suit that we decide is appropriate.

---

[3] Dkt. No. 58 at ¶ 19.

      b.  "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in: a. "Bodily injury"; or b. "Property damage."

      c.  Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to "bodily injury" or "property damage":

          i.  Which is expected or intended by one or more "insureds."

## C.    State Court Proceedings

25. On October 26, 2012, Bunnenberg commenced a civil action against McCormack in Nassau County Supreme Court alleging assault and battery and negligent and/or reckless behavior.[4]

26. The claim was tendered to Liberty Mutual on March 1, 2013.

27. Liberty Mutual acknowledged receiving notice of the claim on March 6, 2013, and acknowledged receipt of the state court complaint on March 13, 2013.

28. Liberty Mutual hired an independent law firm, Mulholland Minion Davey McNiff & Beryer, to defend McCormack in the state court action.  Brian R. Davey, Esq. was McCormack's attorney.

29. Liberty Mutual paid the costs for McCormack's defense.

30. On January 8, 2013, Bunnenberg served a response to McCormack's interrogatories which included the following statement, made under oath:[5]

      a.  Please state with particularity all words, conversations or statements, identifying the person speaking and the words or sum and substance of the

---

[4] *See* Pl. Ex. 14.
[5] Def. Ex. 3.

words uttered by each such person from the time [Bunnenberg] and [McCormack] came into physical proximity with each other on October 26, 2012 until they were no longer in physical proximity with each other.

  i.  RESPONSE: [McCormack] entered the dorm room of Cruz Rivera, which was unlocked but closed, without permission or warning. As [McCormack] entered, she yelled obscenities at [Bunnenberg]. [McCormack] then began yelling obscenities at Cruz Rivera, including "so this is who you're f***ing hanging out with". Mr. Rivera was sleeping at the time but began to wake up with the commotion [McCormack] caused. Both [Bunnenberg] and Mr. Rivera yelled back at [McCormack], telling her to get out of the room. [McCormack] then, unprovoked, began to punch [Bunnenberg] in the face. At no time did [Bunnenberg] hit [McCormack] back. Instead, [Bunnenberg] attempted to block [McCormack's] punches and yelled for Mr. Rivera to help. Mr. Rivera stated that he did not want to interfere because of his previous conflict with [McCormack]. Once [Bunnenberg] began to bleed from the nose and face, Mr. Rivera stepped between [Bunnenberg] and [McCormack]. At that point, [McCormack] reached over him and grabbed [Bunnenberg] by the ponytail in her hair, pulling both [Bunnenberg] and Mr. Rivera forward. [McCormack] then violently let go, propelling [Bunnenberg] down so that her head struck the corner of the bed and [Bunnenberg] lost consciousness. The next

6

thing [Bunnenberg] remembers, Mr. Rivera again yelled at [McCormack] to leave the room, and she did.

31. In support of a motion submitted in state court, Bunnenberg submitted an affidavit, sworn under oath, on October 15, 2018, which stated as follows:[6]

    a. [McCormack] entered the dorm room of Cruz Rivera, which was unlocked but closed, without anyone's permission or warning. As [McCormack] entered the room, she yelled obscenities at me. [McCormack] then began yelling obscenities at Cruz Rivera, including "so this is who you're fl'**ing hanging out with". Mr. Rivera was sleeping at the time but began to wake up with the commotion the [McCormack] caused. Both Mr. Rivera and I yelled back at [McCormack], telling her to get out of the room.

    b. [McCormack] then, unprovoked, began to punch me in the face. At no time did I hit [McCormack] back. Instead, I attempted to block [McCormack's] punches and yelled for Mr. Rivera to help. Mr. Rivera stated that he did not want to interfere because of a protective order [McCormack] had taken out against him. Once I began to bleed from the nose and face, Mr. Rivera stepped between me and [McCormack].

    c. At that point, the [McCormack] reached over him and grabbed me by the ponytail in my hair, pulling both me and Mr. Rivera forward. [McCormack] then violently let go, propelling me down so that my head struck the comer of the bed frame and I lost consciousness. The next thing I remember, Mr. Rivera again yelled at [McCormack] to leave the room, and she did.

---

[6] Def. Ex. 6.

32. During Bunnenberg's 2014 deposition, she described the incident as follows:[7]

    a.  Q: And what occurred next?

    b.  A: Then the next thing I can remember is she started punching me in the face over and over, and because I had just had a jaw surgery in June, I was covering the right side of my face with both arms, and she was able to break my left orbit of my eye.

    c.  Q: Okay. And you were covering the right side of your face to protect the area that had surgery; is that correct?

    d.  A: Right.

    e.  Q: So she began striking the left side of your face because there was more access to it?

    f.  A: Right.

    g.  Q: And were you -- did you attempt to punch her as well?

    h.  A: No. . . .

    i.  Q: Okay. Did the both of you remain standing, or did one of you go to the ground or both of you?

    j.  A: We were both standing until he [Rivera] finally stepped in when I started bleeding everywhere, from my nose and my lip, and so he just stood between us, and she was on the other side of the door when he did that, and she took my hair. At that time I had extensions in, so it was long, and she pulled me towards them and then back, and so I fell back and hit my head against the comer of the bedframe.

---

[7] Def. Ex. 5 at 21-23.

     k.   Q: When she pulled your hair?

     l.   A:  Right.  At that time I was on the floor.

33.  On June 22, 2022, the Nassau County Supreme Court entered a consent judgment in Bunnenberg's favor and against McCormack pursuant to the parties' stipulation which states, in relevant part, as follows:[8]

     a.   It is stipulated and agreed that [Bunnenberg] may enter Judgment against [McCormack] in this action in the amount of . . . $350,000[] in the above-entitled action

     b.   [Bunnenberg] agrees that she will only enforce the Judgment against Liberty Mutual; and that she will not attempt to enforce the Judgment against [McCormack] or any of [McCormack's] other assets.  [McCormack] shall not have any personal liability or obligation to pay any amount to [Bunnenberg] as a result of the above captioned lawsuit, and [Bunnenberg] agrees to look solely to the Liberty Mutual Policy for satisfaction.

     c.   Nothing herein shall be deemed to be an admission that coverage exists under the Liberty Mutual Policy for the Judgment, and the Parties recognize . . . that Liberty Mutual intends to contest any duty to indemnify for the Judgment.

### III. CONCLUSIONS OF LAW

**A.**    **Legal Standard**

"In a bench trial such as this, it is the Court's job to weigh the evidence, assess credibility, and rule on the facts as they are presented." *Bahrami v. Ketabchi*, No. 05-CV-3829, 2009 WL 513790, *9 (S.D.N.Y. Feb. 27, 2009) (quoting *Johnson-McClean Techs. v. Millennium Info. Tech.*

---

[8] Pl. Ex. 15.

*Grp.*, No. 02-CV-244, 2003 WL 192175, *8 (S.D.N.Y. Jan. 27, 2003)) (internal quotation marks and alterations omitted); *see also Mathie v. Fries*, 121 F.3d 808, 811-12 (2d Cir. 1997).  "The Court [is] 'in the best position to evaluate [each] witness's demeanor and tone of voice as well as other mannerisms that bear heavily on one's belief in what the witness says.'"  *Bahrami*, 2009 WL 513790, at *9 (quoting *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 634 (2d Cir. 1996)); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) (noting that "only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").  If the "evidence is equally divided . . . 'the party with the burden of proof losses.'"  *Bahrami*, 2009 WL 513790, at *9 (quoting *United States v. Gigante*, 39 F.3d 42, 47 (2d Cir. 1994)); *see also Fulop v. Malev Hungarian Airlines*, 244 F. Supp. 2d 217, 223 (S.D.N.Y. 2003) (finding that "[t]he evidence on this issue is substantially divided and, in the Court's assessment, does not tilt sufficiently to Plaintiff's case to satisfy the preponderance standard").

## B.    Admissibility of Evidence

As an initial matter, the parties disagree about the admissibility of two types of exhibits: (1) transcripts from McCormack and Bunnenberg's depositions and transcripts from McCormack's state court criminal proceedings; and (2) Liberty Mutual Insurance claim notes.  *See* Dkt. Nos. 70, 78.

Liberty Mutual argues that the evidence constitutes inadmissible hearsay.  *See* Dkt. No 70 at 1; *see also* Dkt. No. 77.  Plaintiff argues that the transcripts are certified, constitute sworn testimony, and McCormack's plea allocution "can be seen as the best evidence of McCormack['s] lack of intent to cause harm and this was never contested by Liberty."  Dkt. No. 78 at 7.  As to the

claim notes, Plaintiff contends they are business records which qualifies as an exception to the rule against hearsay. *See id.* at 7-8.

### 1. *Transcripts*

There are five transcripts that the parties seek to have admitted: Plaintiff's deposition transcript dated April 4, 2014; Plaintiff's deposition transcript dated July 24, 2023; McCormack's deposition transcript dated May 9, 2014; a transcript from McCormack's state court plea allocution dated March 25, 2013; and a transcript from McCormack's hearing vacating and dismissing the state criminal charges following her compliance with supervision, dated September 17, 2014.

During trial, the Court admitted Plaintiff's 2023 deposition transcript. *See* Dkt. No. 77 at 69. Plaintiff has not raised any issue in her post-trial submissions with the admission of her own 2023 deposition testimony. *See* Dkt. Nos. 78, 79. However, admission of the other four transcripts is in dispute and their admissibility was reserved on by the Court during trial. *See* Dkt. No. 77 at 23, 70-71, 74. Defendant argues that McCormack's deposition testimony and her statements made during the state criminal proceedings constitute inadmissible hearsay. *See id.* at 9, 14; *see also* Dkt. No. 70. In response to Defendant's motion *in limine*, Plaintiff argued for application of Rules of Evidence 804(b)(1), (b)(3), (b)(6), and 807 to admit the transcripts. *See* Dkt. No. 71 at 3.

As explained in the Court's Memorandum-Decision and Order on Defendant's motion *in limine*, *see* Dkt. No. 67 at 4, "[h]earsay" is defined as "a statement that . . . the declarant does not make while testifying at the current trial or hearing; and . . . a party offers in evidence to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c)(1)-(2). Hearsay is not admissible at trial unless permitted by a federal statute, the Federal Rules of Evidence, or other

11

rules promulgated by the Supreme Court.  *See* FED. R. EVID. 802.  One exception to the hearsay

rule concerns former testimony subject to Rule 804, which states as follows:

> The following are not excluded by the rule against hearsay if the
> declarant is unavailable as a witness:
>
> (1) Former Testimony.  Testimony that:
>
>> (A) was given as a witness at a trial, hearing, or lawful
>> deposition, whether given during the current proceeding or a
>> different one; and
>>
>> (B) is now offered against a party who had--or, in a civil
>> case, whose predecessor in interest had--an opportunity and
>> similar motive to develop it by direct, cross-, or redirect
>> examination.

FED. R. EVID. 804(b)(1).  Additionally, statements against one's interest are not hearsay if the

statements are ones which (1) "a reasonable person in the declarant's position would have made

only if the person believed it to be true because, when made, it was so contrary to the declarant's

proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim

against someone else or to expose the declarant to civil or criminal liability" and (2) the statement

"is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is

offered in a criminal case as one that tends to expose the declarant to criminal liability."  FED. R.

EVID. 804(b)(3).

   The hearsay exceptions under Rule 804(b)(1), (b)(3), and (b)(6) only apply if the declarant

is "unavailable" as defined in Rule 804(a).  A witness can be deemed unavailable if the following

condition is met:

> (a) Criteria for Being Unavailable.  A declarant is considered to be
> unavailable as a witness if the declarant: . . .

(5) is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure:

(A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or

(B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4).

But this subdivision (a) does not apply if the statement's proponent procured or wrongfully caused the declarant's unavailability as a witness in order to prevent the declarant from attending or testifying.

FED. R. EVID. 804(a).

However, "Federal Rule of Civil Procedure 32(a)(4) relieves the proponent of deposition testimony from the requirement to show that it used 'reasonable means' as defined by Federal Rule of Evidence 804(b) to procure the attendance of a witness if, for example, the witness is more than 100 miles from the courthouse (and thus cannot be subpoenaed) . . . ." *Williams v. City of New York*, No. 19-CV-3347, 2023 WL 2911023, *7 (S.D.N.Y. Apr. 12, 2023). Additionally, "[a] deposition lawfully taken and, if required, filed in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." FED. R. CIV. P. 32(a)(8); *see also* Dkt. No. 64 at 4. Finally, pursuant to Rule 807,

Under the following conditions, a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:

(1) the statement is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and

> > (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.
> >
> > > (b) Notice. The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement--including its substance and the declarant's name--so that the party has a fair opportunity to meet it.  The notice must be provided in writing before the trial or hearing--or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

FED. R. EVID. 807.

McCormack was absent from trial.  The only effort that Plaintiff made was by issuing a subpoena a few weeks before trial.  This case was set down for trial on October 4, 2024, during a telephone pretrial status conference.  *See* Text Minute Entry 10/04/2024.  Plaintiff's counsel failed to appear at the conference.  *See id.*  The Court scheduled trial for November 12, 2024.  *See id.* Plaintiff subpoenaed McCormack to appear at trial on October 31, 2024.  *See* Dkt. No. 65-5. McCormack's address is 108 miles from the Courthouse.  Plaintiff provided no information as to whether McCormack received the subpoena, and there is no evidence that Plaintiff's counsel ever maintained contact with McCormack or otherwise attempted to secure her appearance at trial. Plaintiff provided no reasoning for this failure.

This lack of effort is not "reasonable" such that the Court will not consider McCormack to be "unavailable" pursuant to Rule 804(a).  *See United States v. Nesmith*, 29 Fed. Appx. 681, 684 (2d Cir. 2002) (affirming district court decision to conclude that witness was not unavailable when the "witness was crucial to the defense theory of the case from the beginning, and neither the need to secure the attendance of this witness nor the importance of his testimony was a surprise.  While the defense made some efforts to locate the witness, they were not extensive. . . .

14

[T]he defense presented no evidence of efforts to maintain contact with the witness other than during trial—it offered no evidence of efforts during the thirteen months between arrest and trial").

As to Plaintiff's reference to Rules 804(b)(3) and (b)(6), *see* Dkt. No. 71, there is no evidence that Plaintiff was unable to procure McCormack's testimony before trial and no evidence that Defendant wrongfully caused McCormack's purported unavailability. *See* FED. R. EVID. 804(a)(5)(B), (b)(3), (b)(6). Therefore, those rules do not permit admission of McCormack's deposition testimony.

Although the Court concludes that McCormack was not "unavailable" under Rule 804(a), the Court must still consider whether, pursuant to Federal Rule of Civil Procedure 32(a)(4), McCormack's deposition can be admitted as "[a] deposition lawfully taken and . . . involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." FED. R. CIV. P. 32(a)(8). Plaintiff offers McCormack's testimony against Liberty Mutual. As such, the question is whether Liberty Mutual is McCormack's successor in interest and whether her 2014 deposition was taken to the same extent as if it had been taken in this case.

Plaintiff argues that McCormack is Liberty Mutual's predecessor in interest because Liberty Mutual had control over McCormack, it chose her attorneys, it participated in the settlement of the underlying action, and its current attorney, Mr. Potashner was involved in the state court settlement. *See* Dkt. No. 71. Plaintiff provides the Court with correspondence from the underlying action in which another attorney from the law firm retained by Liberty Mutual to represent McCormack, Mr. Davey, wrote to the state court judge. Mr. Davey stated that "[t]his office on behalf of the defendant, Lauren McCormack, had previously written Your Honor with a

proposed judgment which had been approved by my principals at Liberty Mutual Insurance Company, the homeowner's carrier which had been providing a defense to Lauren McCormack during the course of this litigation under a reservation of rights." Dkt. No. 71-4. Plaintiff also provides e-mails that were exchanged between Mr. Davey and Mr. Benes. *See* Dkt. No. 71-5. Mr. Potashner was not involved in the e-mail exchanges, and there is a single reference to him, wherein Mr. Davey asked Mr. Benes if a letter from Liberty Mutual was "from claims or Marshall Potashner." Dkt. No. 71-5 at 2-3. There is no other indication that Mr. Potashner was involved in any way in the state civil action.

Instructive on this issue, the New York Court of Appeals has stated as follows:

> [New York] Insurance Law § 3420 [] grants an injured party a right to sue the tortfeasor's insurer, but only under limited circumstances—the injured party must first obtain a judgment against the tortfeasor, serve the insurance company with a copy of the judgment and await payment for 30 days. Compliance with these requirements is a condition precedent to a direct action against the insurance company . . . . "[T]he effect of the statute is to give to the injured claimant a cause of action against an insurer for the same relief that would be due to a solvent principal seeking indemnity and reimbursement after the judgment had been satisfied. The cause of action is no less but also it is no greater[.]" . . . Once the statutory prerequisites are met, *the injured party steps into the shoes of the tortfeasor and can assert any right of the tortfeasor-insured against the insurance company*.

*Lang v. Hanover Ins. Co.*, 3 N.Y.3d 350, 354-55 (2004) (quoting, *inter alia*, *Coleman v. New Amsterdam Cas. Co.*, 247 N.Y. 271, 275 (1928)) (emphasis added); *see also Interiano v. Arch Specialty Ins. Co.*, No. 23-CV-238, 2024 WL 1117044, *7 (E.D.N.Y. Mar. 14, 2024); *Tech. Ins. Co., Inc. v. Philadelphia Indem. Ins. Co.*, 642 F. Supp. 3d 445, 468 (S.D.N.Y. 2022); *Creinis v. Hanover Ins. Co.*, 59 A.D.3d 371, 374 (2d Dept. 2009).

Here, Plaintiff is the injured party, who obtained a judgment against McCormack as the insured. As such, Plaintiff steps into the shoes of McCormack to assert McCormack's rights under the insurance policy. The Court, therefore, concludes that McCormack is not Liberty Mutual's predecessor in interest. Likewise, the issues during McCormack's 2014 deposition did not concern her insurance policy or whether her conduct was an "accident," which are the issues in this action. As such, Federal Rule of Civil Procedure 32(a)(8) does not save McCormack's deposition testimony from preclusion.[9] Based on the foregoing, the Court will not admit McCormack's 2014 deposition transcript into evidence because it does not meet the requirements of any hearsay exception under the Rules of Evidence or Rules of Civil Procedure.

---

[9] To the extent Plaintiff asks the Court to apply Federal Rule of Evidence 804(b)(1), "[a] motive to develop testimony is 'sufficiently similar' for purposes of Rule 804(b)(1) when the party now opposing the testimony would have had, at the time the testimony was given, 'an interest of substantially similar intensity to prove (or disprove) the same side of a substantially similar issue' now before the court." *Davis v. City of Rochester*, No. 14-CV-6562, 2022 WL 6885334, *6 (W.D.N.Y. Oct. 12, 2022) (quoting *United States v. DiNapoli*, 8 F.3d 909, 914-15 (2d Cir. 1993)). Liberty Mutual did not have anyone present during McCormack's deposition who had the opportunity and motive to develop the deposition in Liberty Mutual's interest. *See* Dkt. No. 77 at 69-70. There was no one present at McCormack's deposition to develop testimony regarding policy coverage and whether McCormack's conduct was "accidental." Plaintiff argues that "[i]f Liberty so wished to question McCormack further about the Incident or her testimony in the underlying case, it could have taken a sworn examination under oath of McCormack at any time, or brought a declaratory judgment action against McCormack, or even took her examination in this case. Liberty cho[]se not to, and the clear reason for this was that Liberty sought to avoid the truth. Liberty should not now be rewarded for failing to exercise its rights." Dkt. No. 71 at 2. Liberty Mutual was not a party to the underlying action. It also had a duty to defend McCormack, but only a duty to indemnify based on the language of the policy. Plaintiff has not provided any authority to support an argument that Defendant was obligated to appear at McCormack's 2014 deposition, bring a declaratory action against McCormack, or seek her deposition testimony in this case. Plaintiff also failed to seek McCormack's deposition testimony in this case despite carrying the burden of proof. Therefore, the Court concludes that Liberty Mutual did not have "an opportunity and similar motive to develop" McCormack's testimony in 2014. *See* FED. R. EVID. 804(b)(1)(B); *see also O'Brien v. City of Yonkers*, No. 07-CV-3974, 2013 WL 1234966, *7 (S.D.N.Y. Mar. 22, 2013) (concluding that prior testimony is inadmissible when the parties against whom it is being offered "were not parties to the prior criminal proceeding" and did not have the same motive as the party in the criminal proceeding).

Next, to preclude admission of the transcripts from McCormack's state criminal proceedings, Defendant relies on *United States v. Zapata*, 357 F. Supp. 2d 667 (S.D.N.Y. 2005). *See* Dkt. No. 77 at 14-15, 17.  Plaintiff cites to *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 20-CV-3140, 2021 WL 1141638, *8 (S.D.N.Y. Mar. 24, 2021), to argue that testimony from a plea colloquy is admissible.  *See* Dkt. No. 77 at 23.

In *Zapata*, the district court determined that "[a]dmissibility of the colloquy pursuant to Rule 804(b)(1) is foreclosed by *United States v. Jackson*, 335 F.3d 170 (2d Cir. 2003)." *Zapata*, 357 F. Supp. 2d at 669.  The *Zapata* court explained that, as concluded in *Jackson*, a plea colloquy is inadmissible where the party against whom it was offered "lacked sufficient opportunity or motive to develop his plea allocution for that allocution to be admissible under Rule 804(b)(1)." *Id.* (citation omitted).  This applies when "the government lacks sufficient motive to cross-examine a defendant at his plea allocution to provide assurance of the testimony's accuracy, since the sole purpose of a plea allocution is to ensure that the defendant's plea is entered knowingly, voluntarily, and grounded on a proper factual basis." *Id.*

In the case cited by Plaintiff, the district court determined that plea allocutions were admissible under Rules 803(22) and 807 because they were being admitted in a civil case against a company, Bernard L. Madoff Investment Securities LLC, which was owned by the defendant who previously pled guilty in his criminal case—Bernard L. Madoff.  *See Bernard L. Madoff Inv. Sec. LLC*, 2021 WL 1141638, at *8.  The district court explained that "[t]he relevant portions of the allocutions concerned whether [the company] was conducting fraud, a fact that was essential to the judgment in those criminal cases. . . ." *Id.*

McCormack's plea allocutions are not admissible because although McCormack's "judgment was entered after a trial or guilty plea," Liberty Mutual did not have the opportunity to

cross examine McCormack and her conviction was not "for a crime punishable by death or by imprisonment for more than a year" nor are the allocutions being "admitted to prove any fact essential to the judgment." Fed. R. Evid. 803(22); *see also* Fed. R. Evid. 804(b)(1).

First, in the Court's September 2024 Memorandum-Decision and Order, it stated that "McCormack's plea allocution is ostensibly admissible at trial . . . and at the very least provides evidence related to the instant motion which McCormack may ultimately be called to testify about at trial." Dkt. No. 46 at 23-24. McCormack did not testify at trial. Further, the Court cited to the *Madoff* cases in its decision, but Madoff's plea allocution statements were being used against his own company. *See id.* (citations omitted). That is not the circumstance currently before the Court where Plaintiff seeks to use McCormack's plea allocution against Liberty Mutual.

Second, McCormack's conviction was not "for a crime punishable by death or by imprisonment for more than a year" and Plaintiff does not seek to admit the evidence to prove a fact essential to McCormack's judgment. FED. R. EVID. 803(22). McCormack originally pled to Penal Law § 120.00(2) for reckless assault in the third degree, and Penal Law § 240.26 for harassment in the second degree. *See* Pl. Proposed Ex. 17. Assault in the third degree requires proof that the defendant recklessly caused physical injury. *See* N.Y. Penal Law § 120.00(2). Assault in the third degree is a class A misdemeanor. *See id.* A person is guilty of harassment when, with intent to harass, annoy or alarm another person, she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same. *See* N.Y. Penal Law § 240.26(1). Harassment in the second degree is a violation. *See id.* After successfully completing supervision, McCormack's assault conviction was vacated, and she entered a conditional plea to the harassment charge. *See* Pl. Proposed Ex.18.

19

Reckless assault in the third degree is a misdemeanor and harassment is a violation; therefore, they are not punishable by more than a year in prison.  Additionally, neither crime required an admission by McCormack that her conduct was unintentional.  The harassment charge required proof of "intent to harass, annoy or alarm,"  N.Y. Penal Law § 240.26, and the assault charge was based on reckless conduct, which is defined as follows: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when *he is aware of and consciously disregards* a substantial and unjustifiable risk that such result will occur or that such circumstance exists.  The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."  N.Y. Penal Law § 15.05(3) (emphasis added).

In her post-trial brief, Plaintiff argues that "Justice Michals [sic] also determined in accepting the charge of Assault Third Degree (Reckless) McCormack did not intentionally cause injury to Bunnenberg, but reckless or unintentionally acted causing the injuries to Bunnenberg." Dkt. No. 78 at 6.  During the state court hearing, McCormack agreed that she "recklessly caused physical injury to Tara Bunnenberg." Pl. Proposed Ex. 17.  She was asked by her own defense attorney if it was "true that you threw her to the floor, causing her to hit her head against the bedframe on October 26th, 2011?" *Id.* at 12.  McCormack responded, "Yes." *Id.*  Although McCormack pled guilty to "reckless" conduct, there is no admission that her conduct was unintentional.  *See* Pl. Proposed Ex. 18.  Accordingly, the transcripts are not admissible under Rule 803(22).

As to Federal Rule of Evidence 807, the plea allocution transcripts are not more probative of McCormack's mental state that other evidence that Plaintiff could have obtained through reasonable efforts.  Plaintiff could have deposed McCormack as part of discovery in this case.

Plaintiff could have issued a subpoena for McCormack's testimony at trial earlier than October 31, 2024, or maintained some semblance of contact with McCormack over the past few years. *See* Dkt. No. 65-5. Likewise, "reasonable notice of the intent to offer the" plea allocutions was not provided to Defendant. FED. R. EVID. 807(b). Plaintiff's attorney did not provide opposing counsel with an exhibit list until the morning of trial, and he presented absolutely no justification for such conduct. *See* Dkt. No. 77 at 3-6. Therefore, the plea allocution transcripts are inadmissible under Rule 807 and will not be considered by the Court.

Finally, Defendant seeks to admit Plaintiff's 2014 deposition transcript. *See* Dkt. No. 77 at 68-69. Plaintiff's deposition transcript is admissible pursuant to Rule 801(d)(2)(A) because Defendant is offering it against Plaintiff and the statements are made by Plaintiff—a party opponent. *See* FED. R. EVID. 801(d)(2)(A). Therefore, the Court will admit the deposition as non-hearsay, subject to the balancing of Federal Rule of Evidence 403. In one of its pre-trial filings, Defendant identified specific portions of Plaintiff's transcripts that it wants the Court to consider. *See* Dkt. No. 50 at 2. Plaintiff has not objected to any of the identified sections of the transcripts. *See* Dkt. Nos. 77, 78. The Court will consider the portions of the transcripts identified by Defendant, accordingly.

### 2. *Insurance Claim Notes*

During trial, Plaintiff sought to admit into evidence Liberty Mutual's claim notes. *See* Dkt. No. 77 at 3. Defendant objected to their admission because the notes are "double hearsay within a third hearsay" as the notes included McCormack's statements "to her criminal defense attorney, who then spoke to Liberty [Mutual]." *Id.* at 11. Defendant agreed that McCormack's statements are "a party opponent," but argued that the party opponent rule does not apply to the statements from McCormack's attorney or the Liberty Mutual employee. *Id.* The Court sustained

Defendant's objection. *See id.* at 12. Plaintiff's attorney contended that "under the Court of Appeals, . . . that is an admissible evidence of the – the insured's attorney speaking to the claim adjuster. The claim adjuster, however, then eventually speaks to . . in the following note speaks directly to Ms. McCormack and confirms everything that . . . the attorney had said." *Id.* Plaintiff's counsel referenced *Aldridge v. Aetna Life Ins. Co.*, 204 N.Y. 83 (1912). *See id.* at 13. The Court sustained Defendant's objection once more, explaining that although McCormack's state of mind is relevant to the case, the claim notes contain "hearsay and double hearsay." *Id.* at 14.

In her post-trial brief, Plaintiff again cites *Aldridge* as well as *Liberty Mutual Ins. Co. v. Sterling Insurance Co.*, 632 F. Supp. 3d 83 (S.D.N.Y. 2022), in which she contends that "Mr. Potashner argued in that case that Claims Notes were admissible as they are the business record of an insurance company. That court granted his motion that Claims Notes are a business record of the insurance company and they were allowed into evidence." Dkt. No. 78 at 8. Plaintiff argues "that when an insured authorizes a representative to speak to the insurer on the insured's behalf, the insurer and the insured are bound by those statements as if it comes directly from the insured" and "[i]t is always preferable to hear information being provided as long as it is reliable." *Id.*

Plaintiff's arguments fail for numerous reasons. First, Plaintiff has not presented any grounds for the Court to reconsider its trial ruling to exclude the claim notes. Generally, in order to reconsider a prior decision, "[t]he moving party must 'point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Sumner v. McCall*, 103 F. Supp. 2d 555, 558 (N.D.N.Y. 2000) (quoting *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). "[T]he prevailing rule in the Northern District 'recognizes only three possible grounds upon which motions for

reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice.'" *Id.* (quoting *In re C–TC 9th Ave. P'ship*, 182 B.R. 1, 3 (N.D.N.Y. 1995)).

Plaintiff has not mentioned the standard for reconsideration in her brief, nor presented any change in law, new evidence, or manifest injustice that would warrant reconsideration of the Court's evidentiary ruling on the insurance claim notes.

Second, Plaintiff has not presented any persuasive case law or argument as to why the insurance claim notes are admissible. The business records exception to hearsay requires proof that (1) the record was made at or around the time by someone with knowledge; (2) the record was kept in the course of regularly conducted activity of a business; (3) the making of the record was a regular practice; and (4) all of these conditions are established by the testimony of the custodian of the record or another qualified witness. *See* FED. R. EVID. 803(6). Plaintiff did not present any evidence at trial or in her post-trial brief concerning any of these prongs. *See* Dkt. Nos. 77, 78.

Additionally, "[w]hile Rule 803(6) does allow admission of certain business records . . . the records 'must be broken down into [their] component parts to assess [their] admissibility,' when the contents are challenged on hearsay grounds." *Hardy v. Adams*, 654 F. Supp. 3d 159, 172 (N.D.N.Y. 2023) (citation omitted). "That is, aside from the reports being admissible, statements within the reports must themselves 'fit into their own hearsay exceptions to be admissible.'" *Id.* (quotation and citation omitted); *see also United States Underwriters Ins. Co. v. ITG Dev. Grp., LLC*, 294 F. Supp. 3d 18, 29 (E.D.N.Y. 2018) ("Courts . . . distinguish between statements in the report made by those with a 'business duty' to report and those who do not. . . .

23

'[S]tatements of witnesses or complaints within [the] reports . . . are hearsay unless they fit into an independent exception to the hearsay rule'") (quotations omitted).

Plaintiff has not presented a single hearsay exception that would allow for admission of the statements within the reports. *See* Dkt. No. 78. The notes are a Liberty Mutual employee's out-of-court statements which reiterate McCormack's defense attorney's statements that McCormack's "position is that this was self defense." Pl. Proposed Ex. 16. Plaintiff offers the notes to prove the truth of the matter asserted: that McCormack's conduct was in self-defense. Plaintiff does not offer any evidence to establish the requirements of the business records exception, nor has she presented any argument as to how the other layers of hearsay could be deemed admissible.

The two cases cited by Plaintiff are unavailing. *See* Dkt. No. 78 at 8. As to *Aldridge*, "[t]he question [wa]s whether a certain letter, written to the defendant by the plaintiff's attending physician, [wa]s binding upon the plaintiff as though it had been written by himself." *Aldridge*, 204 N.Y. at 84. The New York Court of Appeals explained that "[t]here can be no doubt that 'if one party refers another, on a disputed fact, to a third person as authorized to answer for him, he is bound by what his referee answers upon the occasion, as much as if the answer had been given by himself.'" *Id.* However, it concluded that "this rule is not applicable to the case at bar, first, because the particular statements in the letter over which this controversy has arisen were not written at the request of the plaintiff, but rather upon the demand of the defendant; and, second, for the reason that the plaintiff did not see the letter or know its contents until it was produced in court." *Id.* at 84-85. The defendant had requested a statement from the plaintiff's attending physician to determine the injuries the plaintiff sustained from an underlying accident. *See id.* at 85. The court determined that "[t]he request was for information peculiarly within the knowledge

of the attending physician, and for which he alone was to be held responsible.  In these circumstances we think the doctor cannot be regarded as the agent of the plaintiff, and that he is rather an independent outsider for whose mistakes or misstatements the plaintiff cannot be held responsible." *Id.*

Plaintiff contends that the claim notes recite "what Liberty knew at the time and to determine if they acted reasonably or did the[y] put their head in the sand and did nothing to investigate the charges and McCormack's actions. . . .  You can discern from the notes that they are about a conversation over two days that Liberty had with McCormack's legal representative." Dkt. No. 78 at 7-8.  The claim notes consist of numerous redactions that neither party explained to the Court.  *See* Pl. Proposed Ex. 16.  The Court is unaware of who redacted the document, when, and for what reason.  In Plaintiff's post-trial brief, she states that "every other note, thereafter, is redacted without explanation or a privilege log. (See Original Claims Notes attached as Exhibit)." Dkt. No. 78 at 8.  Plaintiff has not attached any "Original Claims Notes" to her post-trial brief.  *Id.* The sole portion of the notes that the Court can glean as being beneficial to Plaintiff is the Liberty Mutual employee's statement that McCormack's attorney said that McCormack's "position is that this was self-defense."  Pl. Proposed Ex. 16.  Even if McCormack's attorney was authorized to speak on her behalf, there is absolutely no indication that the Liberty Mutual employee was permitted to speak on McCormack's behalf.  Therefore, because the statement in the claim notes was authored by someone who did not speak for McCormack and there is no way for the Court to test the reliability of the statements, Plaintiff's reliance on *Aldridge* is inapposite.[10]

---

[10] Insofar as Plaintiff has argued that she attempted to secure the testimony of a Liberty Mutual employee, such argument is unpersuasive.  On October 31, 2024, Plaintiff issued a subpoena to a Liberty Mutual employee with the most knowledge on the subject matter for documents related to McCormack's insurance claim.  *See* Dkt. Nos. 60-1, 66-1.  As explained in the Court's pre-trial ruling, "'[t]he law is clear that trial subpoenas cannot be used to obtain discovery not previously

Plaintiff also cites a case for the contention that Mr. Potashner has previously argued that Liberty Mutual claim notes are admissible as business records. *See* Dkt. No. 78 at 8. Plaintiff's counsel cites the case as being from the Southern District of New York, but the Court has only been able to find a case similar to that which is referred to by Plaintiff out of the Eastern District of New York. It is a decision ruling on a motion for summary judgment. *See Liberty Mut. Ins. Co. v. Sterling Ins. Co.*, 632 F. Supp. 3d 83, 85 (E.D.N.Y. 2022). There is not a single reference in the decision to hearsay, business records, or admissibility of insurance claim notes. *See id.* As such, Plaintiff's reliance on this case is entirely unhelpful to the Court.

Because Plaintiff has failed to present a valid exception to the rule against hearsay and she has not provided any way for the Court to test the reliability of the insurance claim notes, the Court concludes that the claim notes are inadmissible and will not be considered.

## C.    Coverage Under the Insurance Policy

Turning to the merits of the case, Plaintiff argues that Defendant is "[u]nable to showing [sic] of an entitlement to a verdict in their favor." Dkt. No. 78 at 11. Plaintiff states that to determine whether conduct is intentional, the Court must look to the point of view of the insured: McCormack. *See id.* Plaintiff failed to call McCormack as a witness or depose her as part of this case. Rather, Plaintiff asks the Court to rely solely on inadmissible, ten-year-old transcript testimony from proceedings in which neither opposing counsel or the Court were present. Therefore, the Court has no means by which to judge McCormack's credibility concerning her intentions during the incident with Plaintiff.

---

sought.'" Dkt. No. 67 at 17 (quoting *Patrick Baker & Sons Inc. v. St. Killan Candle Co. Ltd.*, No. 3:17-CV-0664, 2021 WL 9563172, *3 (D. Conn. Nov. 29, 2021)).

It is well settled under New York law that "[t]he insured has the initial burden of proving that the damage was the result of an 'accident' or 'occurrence' to establish coverage where it would not otherwise exist . . . .   Once coverage is established, the insurer bears the burden of proving that an exclusion applies."  *Consol. Edison Co. of New York v. Allstate Ins. Co.*, 98 N.Y.2d 208, 220 (2002) (citing *Northville Indus. Corp. v. Nat'l Union Fire Ins. Co.*, 89 N.Y.2d 621, 634 (1997)); *see also Georgetown Cap. Grp., Inc. v. Everest Nat. Ins. Co.*, 104 A.D.3d 1150, 1152 (4th Dept. 2013); *Anderson v. Burlington Ins. Co.*, No. 19-CV-297, 2023 WL 3751929, *6 (W.D.N.Y. June 1, 2023); *McIntosh v. Ronit Realty, LLC*, 181 A.D.3d 581, 582 (2d Dept. 2020). Therefore, Plaintiff's arguments that Defendant has failed to make a *prima facie* case are baseless because the initial burden falls squarely on Plaintiff to prove that McCormack's conduct was an "accident" or "occurrence" as defined in the insurance policy.

It truly defies comprehension that Plaintiff argues McCormack's conduct was an "accident" because McCormack acted in "self-defense" after Plaintiff's words provoked McCormack.  The parties stipulated that Bunnenberg never hit McCormack back after McCormack repeatedly hit Bunnenberg in the face.  *See* Dkt. No. 58 at ¶ 22.  There is not a single shred of evidence in the record that McCormack sustained any injuries, yet Bunnenberg was bleeding from her nose and mouth and had a broken orbital bone.

"Generally, a stipulation of fact that is fairly entered into is controlling on the parties and the court is bound to enforce it."  *Fisher v. First Stamford Bank & Trust Co.*, 751 F.2d 519, 523 (2d Cir. 1984) (citing *Stanley Works v. F.T.C.*, 469 F.2d 498, 506 (2d Cir. 1972)).  "There are, however, three well-recognized exceptions to this general rule.  First, the parties cannot create a case by stipulating to facts that do not exist. . . .  Second, the court is not bound by the stipulation if its acceptance would be manifestly unjust, or the evidence contrary to the stipulation is

substantial. . . .  Third, a court is not required to accept a stipulation regarding a question of law."
*In re Roland*, 294 B.R. 244, 250 (Bankr. S.D.N.Y. 2003) (citing, *inter alia*, *Sinicropi v. Milone*,
915 F.2d 66, 68 (2d Cir. 1990); *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir.
1984); *United States v. John J. Felin & Co.*, 334 U.S. 624, 640 (1948)).

The parties stipulated that Plaintiff did not hit McCormack back during the incident.  See
Dkt. No. 58 at ¶ 22.  Plaintiff has not presented any argument or case law to support the Court
ignoring the parties' stipulation.  Plaintiff's testimony has been consistent in every single
deposition and sworn affidavit she has provided prior to the initiation of this case: she never hit
McCormack and the attack was unprovoked.

In bringing criminal charges against McCormack, Plaintiff signed a complaint on January
18, 2012.  *See* Def. Ex. 6.  Above her signature, the document states in all capital letters that
"false statements made herein are punishable as a class A misdemeanor pursuant to P.L. 210.45."
*Id.*  The complaint states that "defendant approached [deponent] and struck her numerous times
about her face with closed fists.  Deponent further states that defendant then grabbed deponent by
her hair and threw her to the floor, causing her to hit her head against the bed frame."  *Id.*  As part
of Plaintiff's state civil case against McCormack, Plaintiff submitted interrogatory responses that
Liberty Mutual admitted into evidence in this case.  *See* Def. Ex. 3.  The document is signed by
Plaintiff on January 9, 2014, "under the penalties of perjury."  *Id.*  Plaintiff's verification also
states that she "read the foregoing response to interrogatories and know[s] the contents thereof;
and the same is true to my own knowledge, except as to matters therein stated to be alleged to be
upon information and belief, and as to those matters I believe to be true."  *Id.*  In response to an
interrogatory, which asked Plaintiff to "set forth a statement of each and every act or commission

which you claim is the basis of the alleged assault or other wrongdoing on the part of the

defendant," Plaintiff responded, in part, as follows:

> Mr. Rivera was sleeping at the time but began to wake up
> with the commotion [McCormack] caused. Both [Bunnenberg] and
> Mr. Rivera yelled back at [McCormack], telling her to get out of her
> room. [McCormack] then, unprovoked, began to punch
> [Bunnenberg] in the face. At no time did [Bunnenberg] hit
> [McCormack] back. Instead, [Bunnenberg] attempted to block
> [McCormack's] punches and yelled for Mr. Rivera to help. . . .
> [McCormack] reached over him and grabbed [Bunnenberg] by the
> ponytail in her hair, pulling both [Bunnenberg] and Mr. Rivera
> forward. [McCormack] then violently let go, propelling
> [Bunnenberg] down so that her head struck the corner of the bed
> and [Bunnenberg] lost consciousness.

*Id.*

Plaintiff was deposed on April 4, 2014, in her state civil case. *See* Def. Ex. 5. Plaintiff

testified in accordance with her interrogatory responses. *See id.* at 14-19. Specifically, she

testified that McCormack arrived at Cruz's dorm with a friend and McCormack "started cursing

and screaming, and she was yelling at Cruz saying, this is the girl we make fun of all the time;

why are you hanging out with her." *Id.* at 19-20. Plaintiff stated that "[a]fter [McCormack] was

cursing at [her, she] started cursing back, which provoked [McCormack] to get into [Plaintiff's]

face." *Id.* at 21. At this point, they "were both screaming." *Id.* "[T]he next thing [Plaintiff

could] remember is [McCormack] start[ed] punching [Plaintiff] in the face over and over, and

because [Plaintiff] had just had jaw surgery in June, [Plaintiff] was covering the right side of [her]

face with both arms, and [McCormack] was able to break [Plaintiff's] left orbit of [her] eye." *Id.*

Plaintiff was asked if she "attempt[ed] to punch [McCormack] as well," and she responded, "No."

*Id.* at 22.

Cruz did not want to interfere because McCormack "had an order of protection against him." *Id.* However, "he finally stepped in when [Plaintiff] started bleeding everywhere, from [her] nose and [her] lip, and so he just stood between [them], and [McCormack] was on the other side of the door when he did that, and she took [Plaintiff's] hair. At that time [Plaintiff] had extensions in, so it was long, and [McCormack] pulled [Plaintiff] toward them and then back, so [Plaintiff] fell back and hit [her] head against the corner of the bedframe." *Id.* at 22-23.

In support of a motion filed in state court, Plaintiff submitted an affidavit dated October 15, 2018. *See* Def. Ex. 6. Plaintiff signed the affidavit. *See id.* The affidavit reiterates the exact same factual allegations as those set forth in Plaintiff's interrogatory response. *See id.* at ¶¶ 4-7. Specifically, Plaintiff attested that McCormack "then, unprovoked, began to punch me in the face. At no time did I hit Defendant back." *Id.* at ¶ 6.

It was not until this case began, that Plaintiff took the position that the physical attack was "provoked" and that she could not remember exactly what happened. During her 2023 deposition, Mr. Potashner asked Plaintiff if she remembered an incident from October 26, 2011, which was "an incident where Ms. McCormack brutally assaulted and battered" Plaintiff. Pl. Ex. 19 at 13. Plaintiff stated that she "would not say brutally assaulted or anything like that, because [Plaintiff] was not able to see [McCormack's] hand." *Id.* at 13-14. The following exchange occurred:

> Q: Did she punch you and break your eye socket?
>
> A: She did not punch because I was not able to see her hand. I felt pain and so I used the word punched to describe the pain but I had closed my eyes when this was happening.
>
> Q: Then did she hit you with something you don't know what it was in the eye socket that broke your eye socket; is that correct?
>
> A: Yes.

*Id.* at 14.

Mr. Potashner then reviewed a 2018 criminal complaint that Plaintiff signed.  *See id.* at 15.
Plaintiff testified that although it was her signature on the complaint, she did not recall signing it.
*See id.* at 16.  However, Plaintiff agreed that she read it before she signed it.  *See id.* at 17-18.  As
to the substance of the statement contained in the criminal complaint, Plaintiff agreed that
everything was accurate, except she did "not remember saying closed fist.  I never saw her hand.
I closed my eyes and protected one side of my face that just had jaw surgery."  *Id.* at 19.  Plaintiff
testified that McCormack "could have been just hitting me with an open fist.  I honestly have no
idea.  I closed by eyes and put my hands over my face."  *Id.* at 20.  However, she agreed that the
result of being hit in the face, her orbital bone was broken.  *See id.*  When asked about the pulling
of her hair, Plaintiff said, "[a]ll I can remember is Cruz stepped in and I fell back and my hair got
in between them or she grabbed me.  I'm not sure but after that I had fallen, and hit my head and
went unconscious."  *Id.* at 22.  The following exchange occurred:

> Q: If you're not sure why did you write under oath pursuant
> to penalty of perjury she grabbed your hair?
>
> A:  I did not write that.  It was also at a time I was going
> through PTSD.  I mean my hair was involved.  Then I had
> fallen to the floor and lost consciousness. . . .
>
> Q: Where it says you signed under penalties of perjury that
> she struck you numerous times about your face with a
> closed fist.  At that time you signed it, did you think it was
> true?
>
> A:  That was 12 years ago, but I know what is true now.  I
> closed my eyes.
>
> Q: I understand that.  Why did you sign under oath subject
> to criminal prosecution for lying, she struck you in the your
> face with closed fist if that didn't happen?

A: I just remember the DA told me sign here.

Q: You signed a document that the DA told you to sign that is inaccurate. Is that what you're testifying?

A: I signed it because he told me to sign here.

Q: Did you read it before you signed it?

A: I honestly don't remember. I was going through a lot. I had PTSD. . . .

Q: Well, when you signed this under the penalty punishable as a misdemeanor, did you tell the DA I'm not comfortable signing this because I don't have this memory?

A: I did not remember. This was 12 years ago.

Q: Was that the way you would have reacted, you would have signed something false because a DA told you to sign it?

A: When you're going [through] extreme PTSD and anxiety and all of that, and you have a ADA that is to help you, and you're only 20 years old, but I did not remember saying closed fist.

Q: Let me ask you this. Is your memory of the incident clearer now or back in January of 2012 when you signed this document?

A: I believe it's probably clearer now because back then I had extreme anxiety and PTSD.

*Id.* at 22-26.

    Next, Mr. Potashner reviewed Plaintiff's interrogatory responses. *See id.* at 36. He asked

Plaintiff if she signed the document before a notary public, yo which she said, "I believe so. It's

been a long time. It's look [sic] like that." *Id.* at 37. Plaintiff believed that someone at Mr. Benes'

law firm drafted the responses. *See id.* Plaintiff agreed that she read the responses before signing

the document. *See id.* at 38. She also believed the answers to be true at the time she signed the

document. *See id.* Plaintiff testified that most of her responses were "about information. And then belief was punched. That was just what I used to describe the pain." *Id.* at 42. When asked if McCormack threatened her on the phone with bodily harm, as Plaintiff contended in her interrogatory responses, Plaintiff said she remembered McCormack cursing and screaming and being afraid. *See id.* at 46. She said she does not know what she believed in 2014 when she signed the interrogatory responses because "[i]t's been a very long time." *Id.* at 47. Plaintiff said, "I do not remember 2014." *Id.* at 48.

Plaintiff agreed that she and Rivera yelled at McCormack "to get out of the room." *Id.* at 51. Mr. Potashner asked, "[t]hen it says the defendant unprovoked began to punch Tara in the face. First of all, did you provoke her to punch you in the face?" *Id.* Plaintiff responded, "Absolutely not. I've never been in a fight in my life." *Id.* Plaintiff testified that she did not throw anything, "swing at" McCormack, try to scratch her, or try to punch or slap her. *Id.* at 52. She was asked again, "You agree it was unprovoked?" *Id.* at 53. Plaintiff responded, "Yes." *Id.* She also agreed that she did not hit McCormack back and "was just blocking [her] face." *Id.* at 55.

Mr. Potashner then reviewed Plaintiff's 2018 affidavit with her. *See id.* at 78. She agreed that she signed it. *See id.* at 80. She also agreed that she never told anyone that the statements within the affidavit might be incorrect because of her PTSD. *See id.* at 78. That is despite her having undergone therapy since immediately after the incident in 2011. *See id.* at 79. Plaintiff again stated that she did not entirely agree with the affidavit because, to her, "punch" meant "pain." *Id.* at 81-82. Plaintiff agreed that she never hit McCormack back. *See id.* at 88. As to Plaintiff's hair being pulled, she stated that in 2018, she believed McCormack pulled her hair, but that after "working through this entire thing," she does not "remember who had [her] hair or who

was caught between them because [Rivera] stood in between" Plaintiff and McCormack.  *Id.* at

90.  Plaintiff said that her prior statements were not "inaccurate.  My answer is I don't know if it

was her who pulled my hair or how my hair got caught between the two of them. . . .  I know she

was reaching and Cruz stepped in the middle.  I don't know if she was trying to reach for my hair

or reach at him to push him away.  I'm not sure."  *Id.* at 112.[11]

During the bench trial, Plaintiff's testimony was largely consistent with her prior sworn

statements and deposition testimony, until the issue of provocation was addressed.  Plaintiff

testified that she let herself into Rivera's room, who came home later, and they watched a movie.

*See* Dkt. No. 77 at 29-30.  While Rivera was sleeping, his phone kept ringing, which Plaintiff

answered.  *See id.* at 30.  McCormack yelled at Plaintiff saying, "Who the F is this?"  *Id.*  Plaintiff

hung up and started to gather her things to leave.  *See id.* at 31.  McCormack showed up at

Rivera's dorm and was screaming at Plaintiff and Rivera.  *See id.* at 32.  Plaintiff "was screaming

back."  *Id.*  "[A]fter a lot of screaming, [Plaintiff] just felt pain.  [She] closed her eyes and tried to

protect."  *Id.* at 33.  Plaintiff "just felt a – [she] felt a lunge, something that felt like a punch.

[She] had her eyes closed."  *Id.*  When asked, "Who was it that punched you?" Plaintiff

responded, "Lauren."  *Id.*  Plaintiff said, "I feel like I kind of provoked her in a way, I guess.  We

were screaming at each other.  We were both – her – I don't know.  We were both – when you get

into each other's faces, I mean, you know, and kind of escalates."  *Id.*

---

[11] At trial, Plaintiff provided the Court with a copy of Plaintiff's deposition transcript.  *See* Pl. Ex.
19.  However, the transcript ends at page 115.  Defendant attached portions of Plaintiff's
deposition testimony to its motion for summary judgment, filed in October 2023.  *See* Dkt. No.
36-17.  The page numbers go as high as 123 and 124, which does not appear to be the end of the
transcript.  *See id.* at 12-13.  As such, the Court does not appear to have been given Plaintiff's
entire deposition testimony.  In the excerpts provided by Defendant with its motion for summary
judgment, Plaintiff states she never attempted to punch McCormack.  *See id.* at 13.

Plaintiff explained that she was protecting the right side of her face because she had surgery to remove a tumor in her jawbone. *See id.* at 34. Plaintiff explained that "after all of the screaming," she "felt [her] hair being pulled and [she] ended up falling backwards and hitting [her] head on a bedpost." *Id.* at 36. Plaintiff's attorney asked, "Who pulled your hair?" *Id.* Plaintiff responded, "I believe it was Lauren." *Id.* Later in her testimony, Plaintiff confirmed that it was McCormack who pulled her hair. *See id.* at 46.

As in her 2023 deposition, Mr. Potashner then proceeded to review Plaintiff's prior court filings. First, he showed Plaintiff her interrogatory responses, which she agreed she signed. *See id.* at 52. She agreed that she never told anyone her answers were incorrect. *See id.* at 53-54. She explained, however, that she "believe[s] us getting into each other's faces is provoking somebody to do something, fighting back and forth in each other's faces." *Id.* at 55. Mr. Potashner then reviewed Plaintiff's signed and sworn affidavit submitted in state court. *See id.* at 58. Plaintiff agreed that she "never hit [McCormack] back but [she] was in [McCormack's] face screaming at her." *Id.* at 62. Mr. Potashner asked, "So she punched you multiple times, right?" *Id.* at 63. Plaintiff said, "Yes. I just felt pain multiple times." *Id.*

Defense counsel then reviewed the state court criminal complaint with Plaintiff. *See id.* at 64. Plaintiff agreed that she signed the complaint, *see id.* at 65, and that she allowed McCormack to be criminally prosecuted based on her statements in the complaint. *See id.* at 67. On redirect, Plaintiff stated that the language in the criminal complaint about "threw her to the floor," was inaccurate. *Id.* at 81. Plaintiff was then asked if she would change anything in her 2018 affidavit, and she responded, "the word 'unprovoked.'" *Id.* at 83. Mr. Benes asked Plaintiff what she "mean[t] by the word unprovoked," and Plaintiff stated, "[i]t's unprovoked, meant to punch me in

the face. I -- I -- again, when we were yelling in each other's faces, we can't -- it became

provoked." *Id.*

   The Court questioned Plaintiff directly, and Plaintiff agreed that nowhere in her sworn

statements did she state that she yelled at McCormack in any way other than to tell her to get out

of Rivera's room. *See id.* at 85-86. The Court asked Plaintiff if she ever attempted to change or

correct her statements, to which Plaintiff said she "never got a chance to go back to it." *Id.* at 87.

   Plaintiff's testimony lacks credibility. It was not until trial that Plaintiff began to recant

her sworn statements that McCormack's physical attack was unprovoked. Plaintiff's 2012, 2014,

and 2018, statements, do not differ from her more recent, 2023, statements. Plaintiff stated in her

2023 deposition, when asked if she "provoke[d] [McCormack] to punch you in the face":

"Absolutely not. I've never been in a fight in my life." Pl. Ex. 19 at 51-52. Throughout the

thirteen-year history of this incident that has been following Plaintiff, she has never tried to

change her sworn statements or testimony or inform anyone that her statements required

clarification. Not until this case was brought, and the Court concluded on summary judgment that

a reasonable jury might "conclude that McCormack, as she attested and articulated in her plea

allocution, did not intend to harm Bunnenberg but rather Bunnenberg was harmed by

McCormack's unintentional, albeit reckless, acts of attempting to defend herself from

Bunnenberg's attack," did Plaintiff begin to assert that she "provoked" McCormack with her

words. Dkt. No. 46 at 30.

   As explained by the Court in its summary judgment decision, "[f]or an occurrence to be

covered under the [subject] polic[y], the injury must be unexpected and unintentional. We have

read such policy terms narrowly, barring recovery only when the insured intended the damages.'"

Dkt. No. 46 at 22 (quoting *Cont'l Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640, 649 (1993)).

Specifically, "in determining whether a claim constitutes an 'occurrence', 'courts interpreting similar provisions have opined that certain intentional acts, which actually cause their intended consequences, are not considered 'accidents.'" *Id.* at 26 (quoting *Cent. Mut. Ins. Co. v. Willig*, 29 F. Supp. 3d 112, 119 (N.D.N.Y. 2014)). "Where 'the harm to the victim was inherent in the nature of the acts alleged (and admitted by plaintiff) and that the harm flowed directly and immediately from plaintiff's intentional acts and, thus, the resulting injuries were intentional and expected, as a matter of law.'" *Id.* (quoting *Smith v. N.Y. Cent. Mut. Fire Ins. Co.*, 13 A.D.3d 686, 688 (3d Dept. 2004)). "The analysis of whether injury was caused by an 'occurrence,' as necessary to fall within the insuring agreement, is the same as the analysis as to whether the claim falls within the exclusion for injury [w]hich is expected or intended by one or more insureds." *Id.* at 26-27 (quoting *Metro. Prop. & Cas. Ins. Co. v. Sarris*, No. 1:15-CV-0780, 2017 WL 3252812, *10 (N.D.N.Y. July 28, 2017)) (additional quotation marks omitted).

The cases cited by Plaintiff to support her argument that Defendant failed to prove that the intentional acts exclusion applies are inapposite. Each of the cases concern summary judgment motions and determining whether a criminal conviction forecloses the possibility of applying the intentional act exclusion as a matter of law. *See* Dkt. No. 78 at 12 (citing *State Farm Fire & Cas. Co. v. Chauncey McCabe*, 162 A.D.3d 1294, 1295 (3d Dept. 2018); *Allstate Ins. Co. v. Zuk*, 78 N.Y.2d 41, 43 (1991); *Slayko v. Sec. Mut. Ins. Co.*, 98 N.Y.2d 289, 293 (2002)). Here, the issue is not whether Liberty Mutual has established that the intentional acts exclusion applies as a matter of law. Rather, the issue is whether McCormack's conduct was an "occurrence" as defined in the policy, *i.e.*, whether her conduct was unintentional. The Court agrees that "'more than a causal connection between the intentional act and the resultant harm is required to prove that the

harm was intended.'" *Slayko v. Sec. Mut. Ins. Co.*, 98 N.Y.2d 289, 293 (2002) (quoting *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 160 (1992)).

However, every ounce of evidence before the Court indicates that the harm to Plaintiff was intended and this is shown by more than a causal connection between the act and harm. The evidence indicates that McCormack threatened Plaintiff with bodily harm, McCormack stormed into Rivera's room uninvited, and McCormack hit Plaintiff so many times, pulled Plaintiff's hair, and released Plaintiff's hair so aggressively that she broke Plaintiff's left orbital bone and caused Plaintiff's nose and/or lip to bleed. Regardless of whether McCormack used a "closed" fist, the evidence is that McCormack repeatedly hit Plaintiff after threatening Plaintiff with physical violence, and Plaintiff never hit McCormack or threatened her. Only once before trial did Plaintiff state that "[a]fter [McCormack] was cursing at [her, she] started cursing back, which provoked [McCormack] to get into [Plaintiff's] face." Def. Ex. 5 at 21. However, there is no evidence that Plaintiff ever provoked McCormack to physically assault Plaintiff or that Plaintiff ever assaulted McCormack such that any of McCormack's conduct could be deemed unintentional.

Plaintiff argues that "Liberty's reliance entirely upon Bunnenberg's personal beliefs and view of the 'circumstances' of the [i]ncident as its sole 'proof' that McCormack intended to cause injury to Bunnenberg is sorely misplaced." Dkt. No. 78 at 12. But it is Plaintiff who bears the initial burden of proving coverage under the policy (which as courts have stated, requires the same analysis as determining whether conduct was intentional under an intentional act exclusion). *See Metro. Prop.*, 2017 WL 3252812, at *10. Plaintiff has failed to come close to meeting her burden because she has relied on only her own testimony from 2012 through 2023 in which she stated that McCormack's conduct was unprovoked. It was only in 2024, that Plaintiff began to

testify that she yelled at McCormack so aggressively that it provoked McCormack's violent assault.  Such testimony at the bench trial was not credible.

The harm Plaintiff suffered to her face and head is "'the intended result which flows directly and immediately from [McCormack's] intentional act, rather than arising out of a chain of unintended though foreseeable events that occurred after the intentional act.'" *Allstate Vehicle & Prop. Ins. Co. v. Mars*, 533 F. Supp. 3d 71, 79 (E.D.N.Y. 2021) (quoting *Mary & Alice Ford Nursing Home Co. v. Fireman's Ins. Co. of Newark, N.J.*, 86 A.D.2d 736, 737 (3d Dept. 1982)). To the extent Plaintiff attempts to argue that the hair pulling incident and punching should be analyzed separately, "'New York has adopted the prevailing modern view that, once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.'" *Unitrin Auto & Home Ins. Co. v. Sullivan*, 162 N.Y.S.3d 689 (Sup. Ct. 2022) (quoting *Salimbene v Merchants Mut. Ins. Co.*, 217 A.D.2d 991, 994 (4th Dept. 1995)).  Likewise, even if the Court had admissible evidence supporting a theory that McCormack's conduct was in self-defense, "self-defense is merely a motivation or justification for conduct that would otherwise be intentional and unlawful.  It is clear, even under the law of this state, that self-defense does not negate intentionality." *Leo v. New York Cent. Mut. Fire Ins. Co.*, 520 N.Y.S.3d 842 (Sup. Ct. 2014), *aff'd as modified*, 136 A.D.3d 1333 (4th Dept. 2016).  "When properly raised in a criminal case, the 'defense does not operate to excuse a criminal act, nor does it negate a particular element of a crime.  Rather, by recognizing the use of force to be privileged under certain circumstances, it renders such conduct entirely lawful.'" *Id.* (quotation omitted).  "In the civil context, it is an affirmative defense which if established renders the alleged tortfeasor not liable . . . .  Simply put, an act of self-defense is

39

still an intentional act resulting in harm.  While there may not be civil or criminal liability, the question of policy coverage remains unaffected."  *Id.* (citation omitted).

Plaintiff argues in her post-trial brief that "McCormack then grabbed Bunnenberg's hair from behind and, possibly, over Rivera.  Bunnenberg was pulling away hard to get out of McCormack's grasp of her hair.  McCormack, *either let go of Bunnenberg's hair or Bunnenberg pulled free of McCormack's grasp*.  Bunnenberg went forward and fell striking her head against the metal bedframe and being knocked unconscious.  Striking of the face and the, later, pulling of the hair are 2 separate incidents . . . ."  Dkt. No. 78 at 10 (emphasis added).  However, the parties stipulated that "McCormack reached over Rivera, grabbed Bunnenberg by the ponytail in her hair, pulling both Rivera and Bunnenberg forward, *and McCormack then let go*, propelling Bunnenberg to fall down so that her head struck the corner of the bed."  Dkt. No. 58 at ¶ 19 (emphasis added).  There is no evidence in the record to support a finding of fact that Bunnenberg caused herself to fall and lose consciousness after pulling away from McCormack.

Each swing of McCormack's arm, whether it was with a closed fist or open hand, was intended to make contact with Plaintiff's face.  She intended to grab Plaintiff's hair.  Although there is no evidence that McCormack intended to break Plaintiff's orbital bone or cause Plaintiff to lose consciousness, there is sufficient evidence in the record to conclude that McCormack fully intended to physically engage with Plaintiff.

The Court is sympathetic to what Plaintiff had to endure in 2011 from discovering oral cancer, undergoing a bone graft, the assault underlying this case and the additional injuries stemming from it, and the immense cost associated with her medical bills.  However, there is no admissible evidence that has been placed before the Court on which it could possibly find that

McCormack's conduct was an accident or unintentional.  Therefore, Plaintiff has failed to prove that she is entitled to coverage under the insurance policy and her claim must be dismissed.

**D.    Conduct of Plaintiff's Counsel**

Throughout this pendency of this case, Plaintiff's counsel Christopher Benes, Esq. has not been compliant with the Court's orders and rules.  For example, despite Defendant removing the action to this Court in November 2022, Mr. Benes did not become admitted in the Northern District of New York until May 2023.  *See* Dkt. No. 15; Text Minute Entry 05/10/23.  Then, Mr. Benes failed to appear for a discovery conference.  *See* Text Minute Entry 06/15/23.  Despite being ordered to file a status report on June 27, 2023, *see* Dkt. No. 24, Mr. Benes filed his letter two days late on June 29, 2023.  *See* Dkt. No. 27.  On July 14, 2023, Magistrate Judge Stewart sanctioned Plaintiff because of Mr. Benes' failure to appear for the conference, failure to respond to the attempts to contact him, and failure to comply with discovery orders.  *See* Dkt. No. 31. Magistrate Judge Stewart concluded that the appropriate sanction was a judicial finding of fact in Defendant's favor.  *See id.* at 8.  He cautioned Mr. Benes "that any additional non-compliance with discovery obligations or with future court orders may result in additional sanctions, including the dismissal of Plaintiff's case."  *Id.* at 9.

On October 31, 2023, Defendant moved for summary judgment, *see* Dkt. No. 36, which this Court denied.  *See* Dkt. No. 46.  The Court scheduled a telephone pretrial conference, at which Mr. Benes did not appear.  *See* Text Minute Entry 10/04/24.  The Court waited ten minutes to begin the conference and made several attempts to reach Mr. Benes, none of which were successful.  *See id.*  The Court scheduled the bench trial and ordered that all pretrial submissions be submitted by October 29, 2024.  *See* Dkt. No. 49.  Defendant complied with this deadline.  *See* Dkt. Nos. 51, 52, 53, 54, 55.  Mr. Benes, however, filed a letter on the day submissions were due

asking for a two-day extension.  *See* Dkt. No. 56.  The Court granted the extension request, giving

Plaintiff until October 31, 2024, at 5:00 PM to file all pretrial submissions.  *See* Dkt. No. 59.

Plaintiff did not file any pretrial submissions with the Court.  This was despite being required to

do so as ordered in the Court's Bench Trial Order.  *See* Dkt. No. 49.

      During the Court's final pre-trial conference on November 5, 2024, the Court ordered Mr.

Benes to produce a witness list by 12:00 PM.  *See* Text Minute Entry 11/05/2024.  Plaintiff

complied and also filed responses in opposition to Defendant's motions *in limine*.  *See* Dkt. Nos.

61, 63, 64, 65.  Defendant filed multiple motions to quash subpoenas—one of which pertained to

a subpoena served on Defendant's trial counsel, Mr. Potashner.  *See* Dkt. Nos. 62, 66.  Another

subpoena was served on a Liberty Mutual employee, seeking documents.  *See* Dkt. No. 67.  The

Court was, quite frankly, taken aback to learn that Mr. Benes served a subpoena on Defendant's

trial counsel.  It is basic knowledge that a trial lawyer cannot be a witness in his or her own case,

except in very exceptional circumstances.  Every trial lawyer should also know that trial

subpoenas cannot be used to seek additional discovery material.  Mr. Benes' subpoenas were

inappropriate and nonsensical, which resulted in the Court granting most of Defendant's motions

to quash.  *See* Dkt. No. 67.

      As for his conduct at trial, Mr. Benes sought to begin his case in chief by reading exhibits

into the record.  *See* Dkt. No. 77 at 2.  This was despite Plaintiff failing to provide the exhibits to

Defendant's counsel or the Court.  *See id.* at 3-5.  Mr. Benes submitted his exhibit list the morning

of trial, written in thick black marker which was nearly illegible.  *See* Dkt. No. 74-1.  Despite

repeatedly emphasizing in all of his filings that this case hinges on the intent of McCormack, he

failed to secure her appearance at trial.  Rather, the sole witness at trial was Plaintiff, whose

intent, as repeatedly argued by Mr. Benes, is irrelevant.  *See* Dkt. No. 78 at 11.

As part of the Court's summary judgment decision, it noted that its evidentiary and coverage decisions were largely dependent on whether McCormack testified and who a jury believed. *See* Dkt. No. 46 at 24-25, 30. Even though this case proceeded to a bench trial instead of a jury trial, the Court was provided absolutely no means by which to determine whether McCormack is believable because McCormack did not testify, and all of her prior testimony is inadmissible. Considerable time and energy have been spent on this case by counsel and the Court. The Court is quite disappointed that those resources have not been better utilized.

### IV. CONCLUSION

After carefully reviewing the parties' pre-trial submissions, the trial transcript and exhibits, and the parties' post-trial briefs, the applicable law, and for the above-stated reasons, the Court hereby **ORDERS** that Plaintiff's demand for $350,000 is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendant's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: January 21, 2025
      Albany, New York

Mae A. D'Agostino
U.S. District Judge